We will turn to Starr Indemnity v. Water Quality Insurance. Mr. Russell, you are on mute. Thank you, Your Honor. May it please the Court, I'm Garrick Russell for Appellant Starr Indemnity & Liability Company. This is an insurance coverage dispute between two underwriters involving costs and expenses incurred to lighter and refloat two grounded barges in the Mississippi River with a combined 31,000 barrels of decant oil, which is a known heavy and hazardous substance. In this appeal, Starr contends that the District Court erred in determining that the barges did not pose a substantial threat of discharge of the oil product in those barges, that the lightening and refloating were not undertaken for the purpose of preventing such a discharge, and had Genesys not undertaken the salvage efforts it did, the Coast Guard would not have ordered Genesys to do so. My question here is whether there was a substantial threat of discharge, that's the key. That's the key, Your Honor. And the District Court discredited the Coast Guard witness, and I guess maybe you'll say that that was error and that there were other errors. Tell us exactly where the District Court erred, because Judge Engelmeyer wrote a very thorough opinion here and seemed to consider everything in great detail. And we need to have pointed out to us where there was fault in that opinion. Sure, Your Honor. So just to go back to the Coast Guard evidence that we secured, it was a joint request between the parties to, pursuant to the TUI regulations, to elicit testimony from the Coast Guard. I'm sorry? Right. Right. And the Coast Guard only allowed deposition by questions, and the procedure was agreed upon between the parties where STAAR would have 10 set of questions, WQS would have 10 set of cross-examination questions, and then we'd have five and WQS would have another five. And that was agreed upon between the parties. The Court allowed that evidence in after the deposition by written questions answers were submitted, but then also did not give it much credit. And I think that's the first point of error, is that the Court should have given Chevron deference to the Coast Guard. Wait a minute. The agreement was not a stipulation, was it? It was an agreement as to how evidence was to be presented. That didn't foreclose the decision by a district judge as to what weight to give to the evidence presented. You're correct, Your Honor, but we believe the Court should have extended Chevron deference to the Coast Guard's responses to the deposition by written questions. So you're making the legal argument that Chevron deference applied and therefore the judge got it wrong on a legal basis. Correct. Not on a weighing and balancing of the evidence. This is a question of deciding a fact at a trial. I don't know about Chevron deference under these circumstances. I mean, this woman was just one witness. There was other evidence brought in. Well, she was, I'm sorry. You know, Chevron deference is usually applied to agency rulemaking or determinations about ambiguities that may exist in a statute. You know, it's a different concept. When an agency gives an opinion about what a statute means within its competence, then we accord Chevron deference. But here, it's just another form of evidence. And why wouldn't he be free to examine this evidence and then all the other evidence and decide what weight to give it? Well, Your Honor, let's first look at who provided the deposition by written questions. It was the federal on-scene coordinator representative. She was the point person, the person in charge of this response. She gave her responses much like a 30 v. 6 witness. She relied on her personal knowledge, speaking to other Coast Guard representatives that were there in the Coast Guard file. What the court should have done once it received this, and there is case law that says that the Coast Guard, which I don't think anybody disputes, is tasked, among other things, with determining whether a substantial threat of discharge exists under OPA. They have that right to come in. Was she informed, misinformed, that there was a small discharge? No, Your Honor. She did not say in her deposition by written questions that there was a small discharge. The court referenced an email from the NPFC which talked about a one-gallon discharge. Which is wrong, which is a mistake. Which is wrong, but there was also in the Coast Guard records, and I refer the court to the appendix page 396, where these are notes by the Coast Guard from April 14th, which is right in the middle of all this was going on, where they described a substantial threat. Two loaded jumbo tank barges carrying approximately 15,000 barrels each of decant oil have run aground, and DU, which I believe means damage undetermined. So the contemporaneous records from the Coast Guard do support what Chief Petty Officer Heather Norman said in her deposition by written questions. What the court should have done, because the Coast Guard is tasked, and they did respond. They responded immediately to the incident. And they eventually ended up sending a strike team who specialized in dealing with pollution issues. It should have applied an arbitrary and capricious standard to whether or not the evidence was, that it should adopt or give deference to the Coast Guard's finding of substantial threat. And we don't think that the court could reach that determination, because in addition to the notes that I previously referenced, there was contemporaneous evidence by the project manager from TNT Salvage, which was the Open 90 Salvo, who stated that the Coast Guard in its discussions, they had daily 2 PM conversations. The Coast Guard indicated that it was concerned with the threat of pollution. You had other witnesses, Mr. Pennington that discussed. Concern over the possibility of pollution is very different from a substantial threat of discharge. Naturally, when barges that are full of oil are grounded, there's a concern. There's no question about that. And that obviously informed a lot of activities here. But that's not the legal issue. That's not the question that we have to deal with. The factual issue, I should have said, of whether there was actual substantial threat of discharge. That's a fact finding by the district court, based upon the evidence before the district court. Well, we believe under the law, the court should have done the analysis of whether or not it should extend deference to the, it should extend deference absent an arbitrary or capricious finding of the Coast Guard. It should not have independent . . . You would make that same argument if we weren't talking about a deposition and that witness were live in the courtroom before the district court. Correct. Do you have any case that says when a witness from an agency comes in, that witness is to be accorded Chevron deference? Well, we have case law where the Coast Guard was given Chevron deference for finding a substantial threat of discharge. And we also have a decision, the Jones versus Grand River Navigation, and that was between two private parties, which we are here today, which first the court looked to see whether it could apply Chevron deference. And when it realized that the Coast Guard had not been tasked with, under the statutes, with the particular finding at issue, it still gave deference. Do you think if an FBI agent gets on the stand and says that the defendant, he's looked at all the evidence, and as far as he's concerned, the defendant is guilty, that the court should accord Chevron deference to that FBI agent? I mean, the agent is in the area of his expertise. He's testifying as to something. I mean, whatever happened to the idea that the district court determines all these issues are the basis of credibility and an understanding of the totality of the evidence. I don't believe that you would do that with an FBI agent because the statute doesn't say that that's his role is to determine guilt. He's just to investigate the facts. He gives a story, and based upon that, he's got expertise. He gets an automatic pass. But in this case- Or an expert. I mean, I don't understand this argument about Chevron deference. Being in this case where you're talking about a factual determination by the district court. But we're entitled to submit the Coast Guard, because Chevron deference is recognized by the Supreme Court. We're entitled to submit the Coast Guard testimony. There's no question about that. And the court should, under the law, because the Coast Guard is tasked with determining under its vast authority under OPA and the National Contingency Plan to determine when a vessel is at risk of a substantial threat of discharge, that the court should give deference to that finding because that's their role to do that. Thank you, Mr. Russell. You've reserved some time. Thank you, Your Honor. We'll hear from Mr. Woods. Thank you, Your Honor. John Woods for Defendant Appellee, Water Quality Insurance Syndicate. On the deference point, I want to get to that right away, although I also want to discuss the insurance aspects of this case, because, as Mr. Russell points out, this is an insurance case at Foundation. But on the deference point, two things quickly. First, this was not a deference case at the court below. This is the first time this issue has been raised on appeal, and it comes, frankly, too late. It has been waived, and we think the court should recognize that. But perhaps even the bigger point on the deference is that what the plaintiff is trying to do by arguing belatedly the Chevron deference, which does not apply here for reasons I'll describe in a moment, what they're trying to do is overturn a five-day trial, a 46-page decision written by Judge Engelmeyer based on live testimony, live witness testimony, witnesses who were on scene at the time, as well as deposition testimony, exhibits, and expert testimony, and throw that out, throw that finding out, which was, as has been pointed out here already, a detailed, thorough investigation by the district court judge. Throw it out in favor of a statement by a Chief Petty Officer given under questionable circumstances to which the district court found no weight should be given. And throw it out not because of what should be the standard here, because the finding of the court below was clearly an error, but throw out that finding because deference should be given to a piece of evidence which the court weighed its reliability of and determined it was wanting, determined, in fact, it was false, and throw out the results of a five-day trial in favor of a false statement by the Coast Guard. That just cannot be. That cannot be the right test, and Chevron does not permit it either. This is not a Chevron case. As has been pointed out, Chevron is applied where there is an ambiguous statute or regulation, where there's a gap in the law or regulation that needs to be filled by an agency. There's no such gap here. On the contrary, the court below agreed with and adopted the Coast Guard's, and it's found in Chief Petty Officer Norman's written answers to written deposition questions. It adopted the definition she cites of substantial threat of a discharge, which is found at 33 CFR 155.1021. And that definition is that a substantial threat means that there is a, quote, significant risk, close quote, of a discharge. Now, the court below agreed with that, interpreted it on its plain meaning, using even a dictionary definition, which is found in the decision of the court below, and found that there was no substantial threat. So there's not an ambiguity that's been filled by the agency here. There's simply a statement by, two years, by the way, after the actual casualty, two years after the casualty, the agency came into this court, came into this case with a statement of dubious merit and dubious reliability, and the court weighed its probative value and rejected it. And that's the exact evidence that the plaintiffs now want this court to base an overturning of the decision below on. Again, that cannot be. The 46-page decision finding there was no substantial threat was entirely based on factual findings. And just to remind the court of the result, what Judge Engelmeyer said quite clearly was that, quote, the salvage and lightering was undertaken here to liberate the stranded barges. The evidence does not reflect, and the participants in real time did not conclude, that there was substantial risk of discharge. Rather, the evidence overwhelmingly showed that the barges, by their nature and in the circumstances at hand, were never at risk or anywhere close of the type of failure that might have resulted in an oil discharge. There could be no clearer finding of fact by the judge below that there was no substantial threat of a discharge. And that should be the end of Starr's case. That should be the end of this appeal. Nowhere does Starr argue that the finding of no substantial threat was clearly erroneous. They don't try to meet that test. They can't. They try to make an end run around the clearly erroneous standard by citing the deference, the Chevron deference rule. But Chevron, again, does not apply. There's no issue here of agency's reasonableness, the court below, that in fact there was no determination at all. That's really the kernel of what the finding below was, was that a statement made two years later by Chief Petty Officer Norman in her written answers to written questions, which said that, yes, we thought two years ago there was a substantial threat. The judge below found that that was false, that there was no corroborating evidence, no contemporaneous corroborating evidence, that, in fact, her other answers on the point were quote-unquote elusive, and that not only was there no contemporaneous corroborating evidence, but that all the other evidence, credible evidence by other witnesses, by the salvors themselves, contradicted the statement by Chief Petty Officer Norman. And that's not all. In the record is the entire Coast Guard file on this incident. It runs 334 pages. It starts, I believe, at A332. And nowhere in those 334 pages, if you read them, does it ever say substantial threat. Substantial what? Substantial threat. And that's the touchstone. That's under OPA. That is what is required to be found. Coming back to the insurance aspect of this case, this, as has been pointed out, was a claim by an insurance company against another insurance company, and it was an entirely factual dispute. Starr had to prove. What happened here was when the barges grounded and subsequently were stranded, when the Mississippi River dropped so that they were left high and dry on this sandbar, completely flat, even keeled, they were strong barges, no threat of a spill, no spill, in fact, ever occurred, and no concern about a spill. This was a salvage operation, pure and simple. It was how do we get the barges off the strand. That's what everybody thought of. In fact, the judge below said, quote, Simply put, the court finds that Genesis and Salvor T&T were not motivated at all by an actual or perceived substantial threat of discharge. He says the Coast Guard, quote, did not perceive a substantial threat of a discharge, articulate to other players that there was such a threat, or take action on the basis of such a threat. That was from his findings of fact, again, subject to a clearly erroneous standard. Can you enlighten me a little bit on why this procedure was followed, of written questions and answers in lieu of a regular deposition, subject to cross-examination, normal cross-examination, in which all the points you're making now could have been put to this witness? Well, what happened here was that the parties agreed that they would approach the Coast Guard and ask for a deposition. The Coast Guard refused to give a deposition and instead said they would answer written questions, and then they dictated, the Coast Guard dictated, the means by which the questions would be posed. And that's put through general counsel at the Coast Guard or legal counsel or whatever? Someone within Coast Guard legal made that call, Your Honor, and followed what's known as the TUI rules. It follows a case decision. For an opponent against that? Sorry? Is there any recourse before the court to scrap that procedure? No, there isn't. In fact, there are regs that say that the Coast Guard is protected from and does not have to give a deposition. They do not have to give any. They're protected from coming in and, in fact, could have refused entirely to even have answered the questions. There's no requirement that they do that. But they then dictated the method by which the questions would be asked, and oddly they called questions direct exam questions and cross examination questions. There was no cross examination. All the questions had to be put to them at once, and they answered them all at once. So there was no opportunity to then go back and challenge them on anything. And this is done under the so-called TUI regulations? Is that what you said? Your Honor? You referred to the TUI regulations. Yeah. This goes back a long time, right, to the 1950s. And basically they control, the Coast Guard in these circumstances, controls the presentation of evidence to the court. Right, entirely. They leave no option to the parties. They give what they wish to give and, as I said, could refuse altogether and are protected by statute. I see my time is up. Thank you, Your Honor. Thanks very much. Mr. Russell, you've reserved some time. Thank you, Your Honor. I just want to make one thing clear. Council represented to the panel that there is no indication in the Coast Guard production of the word substantial threat. And appendix page 396, which was part of the FOIA response from the Coast Guard, page 65, at .9 says description of substantial threat, colon, two loaded jumbo tank barges carrying approximately 15,000 barrels each of running ground and DU. So it was in the records. What's that page again? It's appendix 396. And this is from April 14th. This incident occurred on the 6th. It went through to basically the end of April, beginning of May. So this is right in the heart of the response by the Coast Guard that they're identifying in their own records, contemporaneous with what was going on, that they believe this to be a substantial threat. And the court did not recognize that below, did not even refer to it in its decision below. But it's clearly shown in the documents from the Coast Guard that they did contemporaneously consider this a substantial threat. Now . . . Did you bring that to the attention of the district court? Following the decision? No, we've raised it on appeal. Before the court wrote the court's opinion. Yeah. Yes, Your Honor. Yes, this was addressed, and this was part of the package of evidence that was submitted to the court. Part of the package of evidence? It was submitted as evidence to the court, and it was addressed by us also. Mr. Wood suggested at the beginning of his argument regarding this Chevron question that it first arose in this case in the appellate briefing. Is that accurate? No, Your Honor. We specifically said in our trial briefing that when an agency is charged with administration and construction of a statutory scheme, rational determinations by that agency are given considerable weight, and we actually cited the Chevron case for that proposition. Who does, Engelmeyer? Yes, Your Honor. So we did raise it with the lower court, but the court did not give it a Chevron definition. They stay in the district court for whatever it may be worth. Right. One thing I did want to address, though, which I didn't have a chance to before, Your Honor, was just about the coverages provided. We believe that the evidence that was submitted both by the Coast Guard and the contemporaneous evidence from the Salvor and those involved in the project should have led the court to determine that there was a substantial threat of discharge. Now, there's three coverage areas in the WQIS policy that we believe would provide coverage for the expenses that were incurred to mitigate the threat. One of them is . . . Russell, your time is up. I hate to interrupt. Sorry, Your Honor. I appreciate it. That's okay. I gave you some extra time originally, and we have your papers, and we appreciate your argument as well as Mr. Wood's argument. Thank you, Your Honor. Both well done, and we thank you very much. Appreciate your time. Thank you. Thank you.